# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MAINE

| | |
|---|---|
| MATTHEW KEENE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) Civil Action No. _____ |
| MAINE DEPARTMENT OF | ) |
| CORRECTIONS, City of Augusta, | ) |
| County of Kennebec, Maine, | ) |
| Martin Magnusson, Joseph Lehman, | ) |
| Mary Ann Saar, Lars Olsen, | ) |
| Richard Wyse, Robert Lancaster, | ) |
| A.L. Carlisle, Barbara Heath, | ) |
| [FIRST NAME UNKNOWN] Dewitt, | ) |
| Daniel Nee, Rick Rodgers, | ) |
| [FIRST NAME UNKNOWN] Berry, | ) |
| [FIRST NAME UNKNOWN] Cain, | ) |
| Christopher Coyne, Daniel Dickson, | ) |
| [FIRST NAME UNKNOWN] Coyne, | ) |
| [FIRST NAME UNKNOWN] Dotay, | ) |
| [FIRST NAME UNKNOWN] Faus, | ) |
| [FIRST NAME UNKNOWN] Hasson, | ) |
| [FIRST NAME UNKNOWN] Hawkins, | ) |
| Kimberly Ackley Gendron, Matthew Nee, | ) |
| Barry Lemery, Brian MacDougall, | ) |
| [FIRST NAME UNKNOWN] Nichols | ) |
| Jeff Tardiff, Michael Whelan, | ) |
| [FIRST NAME UNKNOWN] Thurwell, | ) |
| N Veilleux | ) |
| | ) |
| Defendants. | ) |

## COMPLAINT AND JURY DEMAND

NOW COMES the Plaintiff, Matthew Keene, by and through his

attorneys, and complains as follows:

## PARTIES AND JURISDICTION

1.      The Plaintiff, Matthew Keene, is a resident of the Town of Standish, County of Cumberland, State of Maine and at all times material herein was a citizen of the United States and was a minor child, and not obtaining the age of eighteen years until 1999;

2.      For all times material hereto until June 4, 1999, the juvenile correctional facility located in South Portland, Maine was named the Maine Youth Center; after that date, pursuant to 34-A M.R.S.A. § 3801, the name of the facility was changed to the Southern Maine Juvenile Facility, and later, the Long Creek Youth Development Center (revised 2001).  For purposes of this Complaint, the facility will be referred to as the Maine Youth Center ("MYC");

3.      The Defendant, Martin Magnusson, during a portion of the time material herein was the Commissioner of Corrections for the State of Maine located at State Office Building, Augusta, Maine and he is sued in his individual capacity;

4.      The Defendant, Joseph Lehman, during a portion of the time material herein was the Commissioner of Corrections for the State of Maine located at State Office Building, Augusta, Maine and he is sued in his individual capacity;

5.      The Defendant, Mary Ann Saar, during a portion of the time material herein was an Associate Commissioner for Juvenile Services for the State of Maine located at State Office Building, Augusta, Maine and she is sued in her individual capacity;

6.      The Defendant, Lars Olsen, during a portion of the time material herein was the Superintendent of Maine Youth Center, located at 675 Westbrook Street, South Portland, Maine and he is sued in his individual capacity;

7.      The Defendant, Richard Wyse, during a portion of the time material herein was the Superintendent of Maine Youth Center, located at 675 Westbrook Street, South Portland, Maine and he is sued in his individual capacity;

8.      The Defendant, Robert Lancaster, during a portion of the time material herein was the Acting Superintendent of Maine Youth Center, located at 675 Westbrook Street, South Portland, Maine and during a portion of the time material herein was the Assistant Superintendent of Maine Youth Center, located at 675 Westbrook Street, South Portland, Maine and he is sued in his individual capacity;

9.      The Defendant, A.L. Carlisle, during a portion of the time material herein was the Associate Commissioner for Juvenile Services for the State of Maine,

3

located at State Office Building, Augusta, Maine and during a portion of the time

material herein was the Director of Rehabilitation and Admission Programs and

during a portion of the time material herein was the Assistant Superintendent of

Maine Youth Center, located at 675 Westbrook Street, South Portland, Maine, and

she is sued in her individual capacity;

10.    The Defendant, Barbara Heath, at all times material herein was a

psychologist for Maine Youth Center, located at 675 Westbrook Street, South

Portland, Maine and she is sued in her individual capacity;

11.    The Defendant, [FIRST NAME UNKNOWN] Dewitt, during a portion

of the time material herein was a Training School Counselor Supervisor for Maine

Youth Center, located at 675 Westbrook Street, South Portland, Maine and during a

portion of the time material herein was a Training School Counselor for Maine

Youth Center, located at 675 Westbrook Street, South Portland, Maine and he is

sued in his individual capacity;

12.    The Defendant, Daniel Nee, during a portion of the time material

herein was a Training School Counselor Supervisor for Maine Youth Center, located

at 675 Westbrook Street, South Portland, Maine and he is sued in his individual

capacity;

13.     The Defendant, Rick Rodgers, during a portion of the time material herein was a Training School Counselor Supervisor for Maine Youth Center, located at 675 Westbrook Street, South Portland, Maine and during a portion of the time material herein was a Training School Counselor for Maine Youth Center, located at 675 Westbrook Street, South Portland, Maine and he is sued in his individual capacity;

14.     The Defendant, [FIRST NAME UNKNOWN] Berry, during a portion of the time material herein was a Training School Counselor for Maine Youth Center, located at 675 Westbrook Street, South Portland, Maine and he is sued in his individual capacity;

15.     The Defendant, [FIRST NAME UNKNOWN] Cain, during a portion of the time material herein was a Training School Counselor for Maine Youth Center, located at 675 Westbrook Street, South Portland, Maine and he is sued in his individual capacity;

16.     The Defendant, Christopher Coyne, during a portion of the time material herein was a Training School Counselor for Maine Youth Center, located at 675 Westbrook Street, South Portland, Maine and he is sued in his individual capacity;

17.     The Defendant, [FIRST NAME UNKNOWN] Coyne, during a portion of the time material herein was a Training School Counselor for Maine Youth Center, located at 675 Westbrook Street, South Portland, Maine and he is sued in his individual capacity;

18.     The Defendant, Daniel Dickson, during a portion of the time material herein was a Training School Counselor for Maine Youth Center, located at 675 Westbrook Street, South Portland, Maine and he is sued in his individual capacity;

19.     The Defendant, [FIRST NAME UNKNOWN] Dotay, during a portion of the time material herein was a Training School Counselor for Maine Youth Center, located at 675 Westbrook Street, South Portland, Maine and he is sued in his individual capacity;

20.     The Defendant, [FIRST NAME UNKNOWN] Faus, during a portion of the time material herein was a Training School Counselor for Maine Youth Center, located at 675 Westbrook Street, South Portland, Maine and he is sued in his individual capacity;

21.     The Defendant, [FIRST NAME UNKNOWN] Hasson, during a portion of the time material herein was a Training School Counselor for Maine Youth

Center, located at 675 Westbrook Street, South Portland, Maine and he is sued in his individual capacity;

22.     The Defendant, [FIRST NAME UNKNOWN] Hawkins, during a portion of the time material herein was a Training School Counselor for Maine Youth Center, located at 675 Westbrook Street, South Portland, Maine and he is sued in his individual capacity;

23.     The Defendant, Kimberly Ackley Gendron, during a portion of the time material herein was a Training School Counselor for Maine Youth Center, located at 675 Westbrook Street, South Portland, Maine and she is sued in her individual capacity;

24.     The Defendant, Barry Lemery, during a portion of the time material herein was a Training School Counselor for Maine Youth Center, located at 675 Westbrook Street, South Portland, Maine and he is sued in his individual capacity;

25.     The Defendant, Brian MacDougall, during a portion of the time material herein was a Training School Counselor for Maine Youth Center, located at 675 Westbrook Street, South Portland, Maine and he is sued in his individual capacity;

26.     The Defendant, Matthew Nee, during a portion of the time material herein was a Training School Counselor for Maine Youth Center, located at 675 Westbrook Street, South Portland, Maine and he is sued in his individual capacity;

27.     The Defendant, [FIRST NAME UNKNOWN] Nichols, during a portion of the time material herein was a Training School Counselor for Maine Youth Center, located at 675 Westbrook Street, South Portland, Maine and he is sued in his individual capacity;

28.     The Defendant, Jeff Tardiff, during a portion of the time material herein was a Training School Counselor for Maine Youth Center, located at 675 Westbrook Street, South Portland, Maine and he is sued in his individual capacity;

29.     The Defendant, [FIRST NAME UNKNOWN] Thurwell, during a portion of the time material herein was a Training School Counselor for Maine Youth Center, located at 675 Westbrook Street, South Portland, Maine and he is sued in his individual capacity;

30.     The Defendant, N. Veilleux, during a portion of the time material herein was a Training School Counselor for Maine Youth Center, located at 675 Westbrook Street, South Portland, Maine and he is sued in his individual capacity;

31.     The Defendant, Michael Whelan, during a portion of the time material herein was a Training School Counselor for Maine Youth Center, located at 675 Westbrook Street, South Portland, Maine and he is sued in his individual capacity;

32.     At all times material hereto based upon their official statuses as employees of the State of Maine Department of Corrections or statuses as being under contract with the State of Maine Department of Corrections, the Defendants were operating under the color of state law;

33.     As a result of their official capacity at all times material herein the above-named Defendants had a duty as to the Plaintiff, Matthew Keene;

34.     At all times material herein the incidents complained of took place in the City of South Portland, County of Cumberland, State of Maine or City of Augusta, County of Kennebec, State of Maine, commencing on or about June 13, 1995 and continuing until Plaintiff was "bound over" to an adult correctional facility at the age of 18;

35.     This action is brought pursuant to Federal Civil Rights Law, 42 U.S.C. § 1983 et seq., the Federal Juvenile Justice and Delinquency Prevention Act, 34 U.S.C. § 11101, et seq., the Individuals With Disabilities Education Act, 20 U.S.C. § 1400, et seq., and the Americans with Disabilities Act, 42 U.S.C. § 12101, et seq.;

36.     This action is also brought pursuant to State Law under the Maine

Juvenile Code, 15 M.R.S.A. § 3001, et seq., and the Maine Corrections Code,

Subchapter V, Maine Youth Center, 34-A M.R.S.A. § 3801, et seq.

## STATEMENT OF FACTS: GENERAL

37.     Beginning when Plaintiff was 13 years old, and continuing until he

was "bound over" to an adult corrections facility at age 18, Plaintiff was

intermittently confined to MYC.

38.     For all periods material hereto, the stated purpose of the Maine

Juvenile Code, which allowed Plaintiff to be removed from the custody of his

parents once adjudicated as having committed a juvenile crime, was "to secure for

any juvenile removed from the custody of the juvenile's parents the necessary

treatment, care, guidance, and discipline to assist that juvenile in becoming a

responsible and productive member of society." 15 M.R.S.A. § 3002(1)(D);

39.     For all periods material hereto, the statutorily established purpose of

MYC was "to rehabilitate" adjudicated juveniles, 34-A M.R.S.A. § 3802(1), which it

must accomplish by employing the disciplines of "education, casework, group work,

psychology, psychiatry, medicine, nursing, applied technology training, and religion

as they are related to human relations and personality development" 34-A M.R.S.A.

§ 3802(2);

40.     For all periods material hereto, security measures in the form of

physically restrictive construction and intensive staff supervision were allowed, but

only if appropriate to accomplish the purposes of the statute. 34-A M.R.S.A. §

3802(2);

41.     For all periods material hereto, the Department of Corrections was

statutorily responsible for ensuring the provision of services necessary to support

and rehabilitate juveniles who come into contact with the Juvenile Court, 34-A

M.R.S.A. § 7001(1)(B); for meeting the service needs for rehabilitation of children

adjudicated as having committed juvenile crimes, 34-A M.R.S.A. § 7002(2); and for

training personnel to perform these functions, 34-A M.R.S.A. § 7002(5);

## EXCESSIVE USE OF ISOLATION

42.     During all times material hereto, it was the policy, custom, and

practice of MYC to employ isolation, defined as physically removing certain children

from the regular program and from contact with other children, by confinement

alone in a locked cell for periods ranging from hours to months;

43.     Prior to 1991, by Maine statute, this practice of isolation was termed "seclusion"; since 1991, this practice of isolation was termed "placing a child under observation" 34-A M.R.S.A. § 3809;

44.     By statute, a child may not be placed in isolation unless he "presents a high likelihood of imminent harm to that juvenile or to others, presents a substantial and imminent threat of destruction of property, or demonstrates a proclivity to be absent from the facility without leave ... the juvenile may be placed under observation if the juvenile demonstrates that anything less restrictive would be ineffectual for the control of the juvenile's behavior."  34-A M.S.A. § 3809(1);

45.     The conditions under which a juvenile is placed under observation must conform with all applicable federal and state standards relating to the health and safety of clients in correctional facilities, 34-A M.R.S.A. 3809(2)(B);

46.     The time a child is held in isolation "may not exceed the period of time necessary to alleviate and prevent the reoccurrence" of imminent harm to the child or others, substantial and imminent destruction of property, or escape from the facility, and "it may not be used as punishment," 34-A M.R.S.A. § 3809(2)(C);

47.     The staff of MYC knew or should have known that the Plaintiff had been diagnosed as suffering from PTSD, depression, and anxiety, among other serious conditions;

48.     Plaintiff was routinely placed in isolation for behavior which did not meet the statutory threshold of high likelihood of imminent harm and, when a less restrictive alternative was available;

49.     Plaintiff was routinely placed in and retained in isolation based on a determination that he presented a high likelihood of imminent harm to himself or others which determination was improperly entrusted to lay people, not trained psychiatrists or psychologists, without any hearing and without written findings showing an adequate basis to justify the decision;

50.     Plaintiff was routinely held in conditions which did not conform to applicable federal and state standards relating to health and safety;

51.     Plaintiff was routinely held for periods which exceeded the time needed to alleviate the high likelihood of imminent harm and was placed in isolation and held in isolation for the specifically proscribed purpose of punishment;

52. MYC used two facilities for isolation, one called the "old Intensive Care Unit" (hereinafter "old ICU") and the other called the "new Intensive Care Unit" or "Intensive Care Unit" (hereinafter "ICU");

53. Confinement in the old ICU meant being placed in one of approximately 15 locked cells, each approximately six feet by eight feet with a concrete and tile bench with a thin mattress, which served as a bed, combination sink/toilet, concrete floor with a center drain, and a light panel in the wall; there was no natural light, no windows, little ventilation, excessive heat in the summer, little heat in the winter, and frequent insect infestations;

54. Confinement in the new ICU meant being placed in one of approximately 15 locked cells, each approximately eight by ten feet with a metal bench bed with a thin mattress, combination sink/toilet, concrete floor, and light panel in the wall; there was an opaque exterior window in some cells, but no clear windows, little ventilation, excessive heat in the summer, and little heat in the winter;

55. Children in either old or new ICU were held in isolation for 23 to 24 hours per day; they received no educational services or other programming during their time in isolation; they received a maximum of one hour per day of major

muscle movement, but only if staff opted to allow it; they were prohibited from

talking with the other children who were also being held in isolation; they could

talk with staff only if staff initiated the exchange; they were prohibited from trying

to look out of the door of the cell; and they had no form of recreation, entertainment,

or diversion except for limited reading material, which was only available as a

privilege at the discretion of the Training School Counselors;

56.    It was the custom and practice of the staff who held children in

isolation to further discipline them by depriving them of exercise opportunities,

showers, mattresses, bedding, clothing, and reading material, by substituting "bag"

meals for regular meals, by withholding or delaying meal trays, and by using a

variety of physical restraints;

57.    It was custom and practice of the staff who held children in isolation to

impose a "step" system and ICU rules, which had to be followed to "gain good time"

in order to earn a release from isolation.  Contrary to statute, this system was

punitive in nature, arbitrary, imposed without due process, used for retribution,

and was imposed with deliberate indifference to the statutory requirement that

confinement in isolation may not exceed the period of time necessary to alleviate a

high likelihood of imminent harm to the juvenile or others;

58.     Plaintiff was subjected to excessive use of isolation in a manner which repeatedly violated the statutory standards for its use, was negligent, was imposed for purposes of punishment, was imposed with deliberate indifference to its impact on Plaintiff's health, was employed in a manner which represented a substantial departure from accepted professional judgment, and violated Plaintiff's Constitutional rights;

59.     On a regular and consistent basis, Plaintiff was subjected to being held in isolation for days and weeks on end;

60.     On a regular and consistent basis, Plaintiff was subjected to being bound in restraints for hours on end;

61.     On a regular and consistent basis, Plaintiff's clothing and bedding were revoked; this regularly occurred during winter months;

62.     This pattern of excessive use of isolation continued throughout Plaintiff's confinements at MYC;

63.     These periods in isolation routinely exceeded 72 continuous hours in isolation;

64.     Prolonged and total isolation such as that practiced at MYC was emotionally and psychologically debilitating for Plaintiff and did not serve goals of treatment or rehabilitation;

65.     The quality of confinement in isolation at MYC for the duration and under the conditions experienced by Plaintiff violated the Eighth Amendment's ban on cruel and unusual punishment;

66.     Contrary to the standards of accepted professional practices, Plaintiff did not receive appropriate psychological and medical services while in isolation;

67.     Contrary to the standards of accepted professional practices, Plaintiff was held in isolation for longer than three hours without being joined by a staff member;

68.     Contrary to the standards of accepted professional practices, Plaintiff was not released from isolation as soon as he was sufficiently under control so as to no longer pose a serious and immediate danger to himself or others;

69.     Contrary to the standards of accepted professional practices, consecutive periods of isolation were used to evade the spirit and purpose of the law;

70.     Contrary to the standards of accepted professional practices, Plaintiff was not afforded any elementary procedural due process prior to confinement in isolation;

71.     Contrary to the standards of accepted professional practices, the decision to place Plaintiff in isolation was not subject to regular, periodic review by professionally competent treatment personnel familiar with the effects of continuing isolation on Plaintiff;

72.     Prolonged confinement in isolation had serious, entirely foreseeable, detrimental effects upon the mental health of Plaintiff: because his problems were not being dealt with during the period of isolation, his behavior deteriorated and his emotional development was inhibited; due to the duration and conditions of confinement in isolation and due to the adversarial, non-professional dynamic between Plaintiff and staff, Plaintiff began to experience severe emotional problems, including: anxiety, depression, and panic, which caused him to persist in aggressive outbursts, which were then used by staff to justify his continued isolation;

73.     Due to the lack of supervision and poorly trained staff, Plaintiff learned maladaptive coping habits such as aggression, intimidation, and violence, as modeled by staff;

74.    Plaintiff resorted to self-harm and acting out with aggression as a means of establishing a modicum of control over his situation;

75.    MYC staff did not respond with appropriate mental health treatment; instead, they increased his isolation, further exacerbating Plaintiff's mental health problems;

76.    It was foreseeable that prolonged isolation in this environment would result in severe damage to his emotional development and mental health, as well as physical pain and suffering;

77.    By statute, MYC's use of isolation was not to exceed 72 hours without approval of the Commissioner of Corrections and that approval must be kept on file;

78.    The Commissioner of Corrections and Assistant Commissioner of Corrections were in charge of the imposition of isolation in excess of 72 hours and were responsible for determining policies relating to extending isolation beyond 72 hours;

79.    The Commissioner and Assistant Commissioner allowed impermissible isolation in excess of 72 hours, failed to remedy the violation, and/or created a policy or custom under which such practices occurred or were allowed to continue;

80.    The Commissioner and Assistant Commissioner were grossly negligent in managing subordinates who caused the unlawful conditions or events, and demonstrated deliberate indifference to the constitutional rights of Plaintiff by failing to act on knowledge of unconstitutional practices;

81.    As a result of excessive confinement in isolation; Plaintiff suffered injuries and damages including but not limited to: post traumatic stress disorder, exacerbation of depression and anxiety, and pain and suffering;

82.    Plaintiff has suffered, and will continue to suffer and incur additional damages in the future, including but not limited to: pain and suffering, lost wages and future earning potential, reasonable and necessary medical treatment expenses, and continued mental health issues;

**EXCESSIVE USE OF RESTRAINTS**

83.    During all times material hereto, it was the policy, custom, and practice of MYC to use mechanical restraints on children designated as "special management clients";

84.    During all times material hereto, the Department of Corrections policy on the use of mechanical restraints was "limited to those situations when it is apparent that the client presents a real and immediate threat to the safety of the

client or others or the security of the facility and only when no other reasonable alternative exists.";

85.    Pursuant to that policy, restraints were to be applied with the least amount of force necessary and in the least restrictive manner possible;

86.    Pursuant to that policy, "[u]nder no condition shall restraints be used to punish or discipline clients";

87.    Pursuant to that policy, "[u]nder no condition shall restraints be used to ... restrain clients in an unnatural position.";

88.    Pursuant to that policy, placement of a child in restraints is videotaped, unless emergency circumstances prevent it;

89.    Pursuant to that policy, restraints should not be used for periods of time exceeding thirty minutes;

90.    Plaintiff was routinely placed in restraints for behavior that did not meet the threshold of immediate and real threat to his own safety or that of others, or when reasonable alternatives existed;

91.    Plaintiff was routinely subjected to excessive force in the application of restraints;

92.    Restraints were used on Plaintiff as a form of punishment;

93.   Restraints were used on Plaintiff which held him in an unnatural position;

94.   MYC Directors and staff breached their duties to Plaintiff by applying and sustaining Plaintiff in restraints without adequate training or knowledge and skill necessary to safely restrain Plaintiff;

95.   Plaintiff was routinely placed in restraints for periods exceeding 30 minutes, and long after any real or immediate threat to the safety of Plaintiff or others, if any had existed, had ceased;

96.   Plaintiff's placement in restraints was not adequately supervised by medical professionals and was delegated to untrained, or under-trained, lay people;

97.   The determination that Plaintiff was no longer a threat to the safety of himself or others was improperly delegated to untrained, or under-trained, lay people, who forced him to yield by "giving his commitment";

98.   As a result of the improper and excessive use of restraints, Plaintiff suffered pain and injuries;

99.   Excessive confinement in mechanical restraints had serious, entirely foreseeable, detrimental effects on the mental health of Plaintiff;

100.    As a result of the improper and excessive use of mechanical restraints, Plaintiff began to experience severe emotional problems, including: anxiety, panic, self-harm, and increased aggression;

101.    MYC staff failed to respond with mental health treatment or support, further exacerbating Plaintiff's mental health problems;

102.    As a direct and proximate result of Defendant's prolonged confinement of Plaintiff in mechanical restraints, Plaintiff suffered severe damage to his emotional development and mental health, mental anguish, and physical pain and suffering, which endures today;

## DENIAL OF A RIGHT TO TREATMENT

103.    During all times material hereto, state statute charged the State of Maine with the duty to attempt to rehabilitate children adjudged to have committed a juvenile offense;

104.    Pursuant to this duty, Plaintiff had a right to adequate treatment;

105.    Pursuant to the 14th Amendment of the United States Constitution, Plaintiff had a right to treatment;

106.    The right to treatment and duty to attempt rehabilitation requires the State to meet minimal standards including: individual assessment to serve as the

basis for an individual treatment plan; periodic evaluation and revision of

individual treatment plans by trained social work or psychological staff; access to

mental health services; education in an accredited school, including utilization of

special education teachers, if applicable, and vocational education; and

rehabilitative treatment designed to reintegrate the child into society;

107.    MYC failed to provide Plaintiff with treatment that met these minimal

standards;

108.    Plaintiff was not afforded mental health treatment even in times of

obvious crisis;

109.    During all times material hereto, the culture at MYC was punitive

rather than rehabilitative, and Plaintiff was consistently punished, rather than

treated or rehabilitated;

110.    Plaintiff did not receive treatment which would have been consistent

with the purposes of confinement;

111.    As a direct and proximate result of Defendants' violation of Plaintiff's

right to treatment, Plaintiff suffered injuries and damages including: post

traumatic stress disorder, exacerbation of his depression and anxiety, pain and

suffering, deprivation of educational services, and deprivation of rehabilitative services;

112.    Plaintiff continues and will continue to suffer and incur additional damages, including but not limited to: pain and suffering, loss of wages and future earning capacity, reasonable and necessary medical and treatment expenses, expenses of remedial education, and expenses for reintegration into society;

## FAILURE TO PROVIDE EDUCATIONAL SERVICES

113.    During all times Plaintiff was in the custody of MYC, Defendants had a duty to attempt to rehabilitate him by employing specified disciplines, including education;

114.    As a person between the ages of 5 and 20, Plaintiff had a statutory right to enroll in a public school to receive an education;

115.    Plaintiff's right to a public education was denied without procedural due process;

116.    Plaintiff was qualified for special education services to allow him to benefit from his education;

117.    Defendants knew or should have known that Plaintiff had been identified as a student in need of special education services;

118.    Defendants had a duty to identify students with disabilities in order to ensure they would receive appropriate educational services;

119.    Defendants had a duty to provide special education services to Plaintiff;

120.    Defendants deprived Plaintiff of all educational services when he was held in isolation;

121.    When Plaintiff was not in isolation, Defendants failed to provide him adequate educational services;

122.    As a direct and proximate result of Defendants' failure to provide Plaintiff with the requisite educational services and educational opportunities, including but not limited to special education services, Plaintiff suffered severe harm during a formative period of his development, including but not limited to: lack of academic progress while committed to MYC, exacerbation of Plaintiff's depression, foreclosure of school-aged educational opportunities, and future lost wages and earning potential;

## FAILURE TO PROVIDE ADEQUATE STAFF

123.    The employment by MYC of persons whose personalities, backgrounds, or lack of qualifications rendered them likely to harm the children in their care

either physically or psychologically, absent any attempt to administer appropriate psychological testing or psychiatric interviews, constitutes a violation of Plaintiff's state and federal rights to treatment;

124.    MYC failed to implement a system to adequately screen prospective employees to determine their psychological suitability for working with children;

125.    MYC failed to implement a system of training or education for employees to ensure they provided individualized treatment to children;

126.    MYC failed to train or educate employees on the use of force in pre-employment interviews;

127.    MYC failed to train or educate employees on avoidance of harm to children in their care, either physically or psychologically, or in the mental health needs of disabled adolescents;

128.    Defendants were at all times responsible for the employment and training practices at MYC;

129.    As a result of their failure to adequately screen prospective employees and to provide adequate pre-service training, it was foreseeable that children in their care would be harmed, both physically and psychologically;

130.    MYC employees and directors did inflict serious physical and psychological harm on Plaintiff in repeated and routine instances while he was in their care;

131.    Plaintiff was harmed both physically and psychologically as a proximate result of the failure of Defendants to comply with the duty of care owed to him;

## DISABILITY

132.    Since his release from MYC in 1999, Plaintiff has been suffering from multiple severe emotional and mental disabilities caused by or exacerbated by Defendants' treatment of him at MYC, including but not limited to: severe PTSD, depression, and anxiety, among other conditions.

133.    Due to his disabilities, Plaintiff's ability to function in society was severely limited, and he was heretofore prevented from protecting his rights and bringing this action against Defendants.

## COUNT I: DEFENDANT MARTIN MAGNUSSON

134.    Plaintiff restates and realleges the statements contained in paragraphs 1-133 of this complaint;

135.    As Commissioner of Corrections for the State of Maine, Defendant

Martin Magnusson was statutorily responsible for the general supervision,

management, and control of clients of MYC (34-A M.R.S.A. § 1402(1)), for ensuring

that MYC met applicable federal and state standards relating to the health and

safety of clients in the facility (34-A M.R.S.A. § 1401(7)), for ensuring the provision

of services necessary to support and rehabilitate Plaintiff (34-A M.R.S.A. § 7002),

and for training personnel to perform that function (34-A M.R.S.A. § 3802);

136.    During the time relevant hereto while he served as Commissioner of

Corrections, Defendant Magnusson failed to properly train subordinates, failed to

control subordinates with a history of misbehavior, failed to ensure that MYC met

applicable federal and state standards relating to the health and safety of clients in

the facility, including Plaintiff's health and safety, and failed to correct

unconstitutional practices or conditions at MYC, including but not limited to:

excessive use of isolation, excessive use of restraints, denial of treatment, lack of

educational services, and lack of appropriate staff;

137.    As Commissioner of Corrections, Defendant Magnusson routinely

extended Plaintiff's time in isolation beyond 72 hours himself, and/or had

knowledge that the Associate Commissioner and others were extending Plaintiff's

time in isolation with no reason given or with the stock phrase that he "continue[s] to be a danger to himself and others" without undertaking the inquiry necessary to authorize continued use of isolation;

138.    As a direct and proximate result of Defendant Magnusson's actions as to excessive use of isolation, Plaintiff was confined in isolation for excessive periods of time, under conditions which did not conform to applicable federal and state standards, and under conditions which constituted cruel and unusual punishment, all in violation of his rights guaranteed in the Eighth Amendment to the United States Constitution, the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution, and in violation of the laws of the State of Maine;

139.    As a direct and proximate result of Defendant Magnusson's actions as to excessive use of restraints, Plaintiff was held in restraints for excessive periods of time, under conditions which did not meet applicable state policies, and under conditions which constituted cruel and unusual punishment, all in violation of his rights guaranteed in the Eighth Amendment to the United States Constitution, the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution, and in violation of the laws of the State of Maine;

140.    As a direct and proximate result of Defendant Magnusson's actions as to denial of the right to treatment, Plaintiff was denied disciplinary, mental health, educational, and rehabilitative treatment owed by the State as a quid pro quo to justify confinement under circumstances in which the conventional limitations of the criminal process are inapplicable, all in violation of his rights guaranteed in the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution, and in violation of the laws of the State of Maine;

141.    As a direct and proximate result of Defendant Magnusson's actions as to denial of educational services, particularly while Plaintiff was held in isolation, Plaintiff was denied educational services required of the State, in violation of his rights guaranteed in the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution, and in violation of the laws of the State of Maine;

142.    As a direct and proximate result of Defendant Magnusson's actions as to failure to provide adequately trained and supervised staff, Plaintiff was subject to physical and psychological harm, all in violation of his rights guaranteed in the Fourth, Fifth, Eighth, and Fourteenth Amendments to the United States Constitution, and in violation of the laws of the State of Maine;

143.    As a direct and proximate result of Defendant Magnusson's breach of his statutory duty, Plaintiff suffered and continues to suffer serious mental anguish, psychological and emotional distress, physical pain and suffering, and lost earning capacity, some or all of which may be permanent;

144.    The actions of Defendant Magnusson, acting under color of state law, deprived Plaintiff of his rights, privileges, and immunities under the laws and the United States Constitution; in particular, the right to be secure in his person, the right to be free from cruel and unusual punishment, and the right to due process;

145.    By these actions, Defendant Magnusson has deprived Plaintiff of rights secured by the Fourth, Fifth, Eighth, and Fourteenth Amendments to the United States Constitution, in violation of 42 U.S.C. § 1983.

**COUNT II:  DEFENDANT JOSEPH LEHMAN**

146.    Plaintiff realleges the statements contained in Paragraphs 1-145 as if more fully set forth herein;

147.    Plaintiff realleges the statements continued in Paragraphs 135-144 above, however substituting the words "Joseph Lehman" or "Lehman" in each place the words "Martin Magnusson" or "Magnusson" appear therein;

148.    By these actions, Defendant Lehman has deprived Plaintiff of rights secured by the Fourth, Fifth, Eighth, and Fourteenth Amendments to the United States Constitution, in violation of 42 U.S.C. § 1983.

### COUNT III:  DEFENDANT MARY ANN SAAR

149.    Plaintiff realleges the statements contained in Paragraphs 1-148 as if more fully set forth herein;

150.    As Associate Commissioner of Corrections for Juvenile Services for the State of Maine, Defendant Mary Ann Saar was delegated powers by the Commissioner which made her statutorily responsible for juvenile services, including but not limited to: general supervision, management, and control of clients at MYC (34-A M.R.S.A. § 1402(1)), for ensuring that MYC met applicable federal and state standards relating to the health and safety of clients in the facility, for ensuring the provision of services necessary to support and rehabilitate Plaintiff, and for training personnel to perform that function (34-A M.R.S.A. § 3802);

151.    Plaintiff realleges the statements contained in Paragraphs 135-144 above, however substituting the words "Associate Commissioner of Corrections" for

33

"Commissioner of Corrections," and "Mary Ann Saar" or "Saar" in each place the words "Martin Magnusson" or "Magnusson" appear therein;

152.    During the time relevant hereto while she served as Associate Commissioner of Corrections for Juvenile Services, Defendant Saar failed to properly train subordinates, failed to control subordinates with histories of misbehavior, failed to ensure that the MYC met applicable federal and state standards relating to the health and safety of clients in the facility, including Plaintiff, and failed to correct unconstitutional practices or conditions at MYC, including but not limited to: excessive use of isolation, excessive use of restraints, denial of treatment, lack of educational services, and lack of appropriate staff;

153.    As Associate Commissioner of Corrections for Juvenile Services, Defendant Saar routinely extended Plaintiff's time in insolation herself, and had knowledge of others doing the same, from time to time, by signing her authorization on inter-departmental memoranda applicable to multiple children, with no reason given or with the stock phrase that Plaintiff is a "danger to self and others," without undertaking the inquiry necessary to authorize continued use of isolation;

154.    By these actions, Defendant Saar has deprived Plaintiff of rights secured by the Fourth, Fifth, Eighth, and Fourteenth Amendments to the United States Constitution, in violation of 42 U.S.C. § 1983.

## COUNT IV:  DEFENDANT LARS OLSEN

155.    Plaintiff realleges the statements contained in Paragraphs 1-154 as if more fully set forth herein;

156.    As Superintendent of the Maine Youth Center, Defendant Lars Olsen was the chief administrative officer of MYC, statutorily responsible for rehabilitating Plaintiff and other clients of MYC (34-A M.R.S.A. § 3802(1)), through use of the disciplines of education, casework, group work, psychology, psychiatry, medicine, nursing, applied technology training, and religion; as it related to the MYC, he was also responsible for ensuring that MYC met applicable federal and state standards relating to the health and safety of clients in the facility, and for ensuring the provision of services necessary to support and rehabilitate Plaintiff, and for training personnel to perform that function (34-A M.R.S.A § 3802;

157.    During the time relevant hereto while he served as Superintendent of MYC, Defendant Olsen failed to properly train subordinates, failed to control subordinates with histories of misbehavior, failed to ensure that MYC met

applicable federal and state standards relating to the health and safety of clients in

the facility, including Plaintiff, and failed to correct unconstitutional practices or

conditions at MYC, including but not limited to: excessive use of isolation, excessive

use of restraints, denial of treatment, lack of educational services, and lack of

appropriate staff;

158.   As Superintendent, Defendant Olsen was statutorily required to

approve placing Plaintiff in isolation each time he was so placed (34-A M.R.S.A. §

3809(2)(A));

159.   As Superintendent, Defendant Olsen was statutorily required to

ensure that Plaintiff was placed in isolation only when Plaintiff's behavior

presented a high likelihood of imminent harm to Plaintiff or to others, presented a

substantial and imminent threat of destruction of property, or demonstrated a

proclivity to be absent from the facility without leave, and as Superintendent, he

was required to ensure that Plaintiff not be held in isolation longer than necessary

to alleviate and prevent the reoccurrence of that behavior, with the very specific

statutory directive that isolation may not be used as punishment (34-A M.R.S.A. §

3809(2));

160.   As Superintendent, Defendant Olsen had statutory responsibilities to ensure a physician or other medical staff visited Plaintiff each time isolation exceeded 12 hours, and at least once in each succeeding 24-hour period, and had a statutory responsibility to direct MYC staff to develop a plan for the further care of the juvenile each time placement in isolation exceeded 24 hours (34-A M.R.S.A. § 3809(2));

161.   As Superintendent, Defendant Olsen had a statutory responsibility to ensure that Plaintiff was under constant sight and sound supervision by MYC staff if he thought it was necessary to prevent imminent harm to Plaintiff (34-A M.R.S.A. § 3809(2)(H));

162.   Defendant Olsen routinely approved placement and retention of Plaintiff in isolation for purposes of punishment or other purposes not authorized by statute;

163.   Defendant Olsen routinely approved or allowed Plaintiff to be kept in isolation for periods in excess of the time required to alleviate behavior which presented a high likelihood of imminent harm;

164.    Defendant Olsen failed to correct conditions of isolation which did not conform with applicable federal and state standards relating to the health and safety of clients in MYC;

165.    Defendant Olsen failed to ensure that a physician or other medical staff visited Plaintiff and made recommendations as required by statute once his time in isolation exceeded 12 hours;

166.    Defendant Olsen routinely and consistently failed to direct appropriate MYC staff to develop a plan for the further care of Plaintiff each time placement in isolation exceeded 24 hours;

167.    Defendant Olsen routinely approved keeping Plaintiff in isolation, or allowed others to keep Plaintiff in isolation, or requested that others extend Plaintiff's time in isolation for times greatly in excess of 72 hours, even though he knew or should have known that the statutorily mandated requirements for holding a child in isolation were not being followed;

168.    Defendant Olsen failed to ensure that staff complied with policies and procedures for placement of children in isolation and failed to have specific policies governing when a child would be placed in isolation and how a child would be removed from isolation;

169.   As a direct and proximate result of Defendant Olsen's actions as to excessive use of isolation, Plaintiff was confined in isolation for excessive periods of time, under conditions which did not conform to applicable federal and state standards, and under conditions which constituted cruel and unusual punishment, all in violation of his rights guaranteed in the Eighth Amendment to the United States Constitution, the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution, and in violation of the laws of the State of Maine;

170.   Accepted practices mandate that a child should be restrained by mechanical means only as a precaution against escape, for medical reasons by direction of the medical officer, or to prevent self-injury or injury of others, and once applied, should only continue until the child is calm and compliant;

171.   Defendant Olsen knew or should have known that mechanical restraints were being applied to Plaintiff frequently, as an improper means of behavior control, for punishment, or for other reasons not sanctioned by written policies, and for time periods far in excess of that even minimally justified by Plaintiff's behavior;

172.   As a direct and proximate result of Defendant Olsen's actions as to excessive use of restraints, including failure to take action to enforce the written

policy, Plaintiff was held in restraints for excessive periods of time, under conditions which did not meet applicable state policies, and under conditions which constituted cruel and unusual punishment, all in violation of his rights guaranteed in the Eighth Amendment to the United States Constitution, the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution, and in violation of the laws of the State of Maine;

173.    Accepted practices require an individualized assessment of every child upon commitment to MYC and the development of a personalized treatment plan for each child; additionally, by statute the Superintendent is required to direct the development of a treatment plan if a child is held in isolation for 24 hours or more, and that plan must be revised as needed to meet the changing needs of the juvenile (34-A M.R.S.A. § 3809(2)(E));

174.    Either Defendant Olsen failed to direct the development of treatment plans for Plaintiff, or, if he did so direct, he knew or should have known that the required treatment plans were not being developed or revised for Plaintiff;

175.    Defendant Olsen knew or should have known that psychologist Barbara Heath failed to adequately diagnose and treat Plaintiff's mental health issues and was recklessly indifferent to his medical conditions, and that she and

other staff failed to provide the statutorily required supervision of Plaintiff's

excessive time in isolation and restraints;

176.   Defendant Olsen failed to provide educational services to Plaintiff,

particularly when Plaintiff was held in isolation, in violation of state law and failed

to ensure that he was provided with the special education services to which he was

entitled;

177.   As a direct and proximate result of Defendant Olsen's actions as to

denial of the right to treatment, Plaintiff was denied disciplinary, mental health,

educational, and rehabilitative treatment owed by the State as a quid pro quo to

justify confinement under circumstances in which the conventional limitations of

the criminal process are inapplicable, all in violation of his rights guaranteed in the

Fourth, Fifth, and Fourteenth Amendments to the United States Constitution, and

in violation of the laws of the State of Maine;

178.   Defendant Olsen, as Superintendent of MYC, hired certain individuals

who were unqualified to work at MYC; failed to ensure that staff were adequately

trained for the work they were to do; failed to supervise staff on the job, particularly

where he knew or should have known of certain staff inadequacies and over-

stressed staff working multiple over-time shifts; failed to provide staff with formal

41

policies and procedures to guide their actions; and failed to timely terminate staff who were clearly unfit for service;

179.    As a direct and proximate result of Defendant Olsen's actions as to failure to provide adequate and adequately trained and supervised staff, Plaintiff was subject to physical and psychological harm, all in violation of his rights guaranteed in the Fourth, Fifth, Eighth, and Fourteenth Amendments to the United States Constitution, and in violation of the laws of the state of Maine;

180.    As a direct and proximate result of Defendant Olsen's breach of his statutory duty, Plaintiff suffered and continues to suffer serious mental anguish, psychological and emotional distress, physical pain and suffering, and lost earning capacity, some or all of which may be permanent;

181.    The actions of Defendant Olsen, acting under color of state law, deprived Plaintiff of his rights, privileges, and immunities under the laws and Constitution of the United States; in particular, the right to be secure in his person, the right to be free from cruel and unusual punishment, and the right to due process;

182.    By these actions, Defendant Olsen has deprived Plaintiff of rights secured by the Fourth, Fifth, Eighth, and Fourteenth Amendments to the United States Constitution, in violation of 42 U.S.C. § 1983.

## COUNT V:  DEFENDANT RICHARD WYSE

183.    Plaintiff realleges the statements contained in Paragraphs 1-182 as if more fully set forth herein;

184.    Plaintiff realleges the statements contained in Paragraphs 156-181 above, however substituting the words "Richard Wyse" or "Wyse" in each place the words "Lars Olsen" or "Olsen" appear therein;

185.    By these actions, Defendant Wyse has deprived Plaintiff of rights secured by the Fourth, Fifth, Eighth, and Fourteenth Amendments to the United States Constitution, in violation of 42 U.S.C. § 1983.

## COUNT VI:  DEFENDANT ROBERT LANCASTER

186.    Plaintiff realleges the statements contained in Paragraphs 1-185 as if more fully set forth herein;

187.    For the portion of the time relevant hereto when Defendant Robert Lancaster served as Acting Superintendent, Plaintiff realleges the statements contained in Paragraphs 156-181 above, however substituting the words "Acting

Superintendent" for "Superintendent," and "Robert Lancaster" or "Lancaster" in

each place the words "Lars Olsen" or "Olsen" appear therein;

188.    As Assistant Superintendent of the Maine Youth Center, Defendant

Robert Lancaster was the assistant to the chief administrative officer of MYC, and

to the extent delegated to him, was statutorily responsible for rehabilitating

Plaintiff and other clients of MYC (34-A M.R.S.A. § 3802(1)), through use of the

disciplines of education, casework, group work, psychology, psychiatry, medicine,

nursing, applied technology training, and religion; as it related to the MYC, he was

also responsible for ensuring that MYC met applicable federal and state standards

relating to the health and safety of clients in the facility, and for ensuring the

provision of services necessary to support and rehabilitate Plaintiff, and for training

personnel to perform that function (34-A M.R.S.A. § 3802);

189.    During the time relevant hereto while he served as Assistant

Superintendent of MYC, to the extent responsibility was delegated to him to do so,

Defendant Lancaster failed to properly train subordinates, failed to control

subordinates with histories of misbehavior, failed to ensure that MYC met

applicable federal and state standards relating to the health and safety of clients in

the facility including Plaintiff, and failed to correct unconstitutional practices or

44

conditions at MYC, including but not limited to: excessive use of isolation, excessive use of restraints, denial of treatment, lack of educational services, and lack of appropriate staff;

190.   As Assistant Superintendent, Defendant Lancaster was statutorily required to ensure that Plaintiff was placed in isolation only when Plaintiff's behavior presented a high likelihood of imminent harm to Plaintiff or to others, presented a substantial and imminent threat of destruction of property or demonstrated a proclivity to be absent from the facility without leave, and he was required to ensure that Plaintiff not be held in isolation longer than necessary to alleviate and prevent the reoccurrence of that behavior, with the very specific statutory directive that isolation may not be used as punishment (34-A M.R.S.A. § 3809(2));

191.   Plaintiff realleges the statements contained in Paragraphs 156-181 above, however substituting the words "Assistant Superintendent" for "Superintendent," and "Robert Lancaster" or "Lancaster" in each place the words "Lars Olsen" or "Olsen" appear therein;

192.    By these actions, Defendant Lancaster has deprived Plaintiff of rights secured by the Fourth, Fifth, Eighth, and Fourteenth Amendments to the United States Constitution, in violation of 42 U.S.C. § 1983.

## COUNT VII:  DEFENDANT A.L. CARLISLE

193.    Plaintiff realleges the statements contained in Paragraphs 1-192 as if more fully set forth herein;

194.    For the portion of the time relevant hereto when Defendant A.L. Carlisle served as Associate Commissioner of Corrections for Juvenile Services, Plaintiff realleges the statements contained in Paragraphs 135-153 above, however substituting the words "Associate Commissioner" for "Commissioner," and "A.L. Carlisle" or "Carlisle" in each place the words "Martin Magnusson" or "Magnusson" appear therein;

195.    For the portion of the time relevant hereto when Defendant A.L. Carlisle served as Assistant Superintendent of the Maine Youth Center, Plaintiff realleges the statements contained in Paragraphs 159-181 above, however substituting the words "Assistant Superintendent" for "Superintendent," and "A.L. Carlisle" or "Carlisle" in each place the words "Lars Olsen" or "Olsen" appear therein;

196.    As Director of Rehabilitation and Admission Programs, Defendant

Carlisle was responsible for ensuring that Plaintiff was not subjected to punitive

use of restraints, excessive periods of time placed in restraints, or kept in isolation

for punitive reasons.  Defendant Carlisle was also responsible for ensuring Plaintiff

received medical and education treatment appropriate for his rehabilitation and in

conformity with his needs and rights. Defendant Carlisle failed to fulfill these

duties;

197.    The actions of Defendant Carlisle, acting under color of state law,

deprived Plaintiff of his rights, privileges, and immunities under the laws and

Constitution of the United States; in particular, the right to be secure in his person,

the right to be free from cruel and unusual punishment, and the right to due

process;

198.    By these actions, Defendant Carlisle has deprived Plaintiff of rights

secured by the Fourth, Fifth, Eighth, and Fourteenth Amendments to the United

States Constitution, in violation of 42 U.S.C. § 1983.

## COUNT VIII:  DEFENDANT BARBARA HEATH

199.    Plaintiff realleges the statements contained in Paragraphs 1-198 as if

more fully set forth herein;

200.    As psychologist for the Maine Youth Center, during the times relevant

hereto, Defendant Barbara Heath was responsible for providing mental health

assessment and treatment for Plaintiff and others, including but not limited to

assessment of children who voiced suicidal thoughts or behaved in ways that

elicited staff concern regarding a risk of self-harm to the child;

201.    As a staff psychologist, Defendant Heath was statutorily required to

ensure that Plaintiff was placed in isolation only when Plaintiff's behavior

presented a high likelihood of imminent harm to Plaintiff or to others, presented a

substantial and imminent threat of destruction of property, or demonstrated a

proclivity to be absent from the facility without leave, and she was required to

ensure that Plaintiff not be held in isolation longer than necessary to alleviate and

prevent the reoccurrence of that behavior, with the very specific statutory directive

that isolation may not be used as punishment (34-A M.R.S.A. § 3809(2));

202.    As a staff psychologist, Defendant Heath had responsibilities to ensure

a physician or other medical staff visited Plaintiff each time isolation exceeded 12

hours, and at least once in each succeeding 24-hour period, and had a responsibility

to ensure that MYC staff developed a plan for the further care of the juvenile each

time placement in isolation exceeded 24 hours, which plan should have included the

assessment and recommendations of Defendant Heath (34-A M.R.S.A. § 3809(2));

203.    Defendant Heath failed to give due consideration to prior psychiatric

and psychological diagnoses and failed to herself diagnose Plaintiff's serious mental

health needs due to his depression, anxiety, and post traumatic stress disorder;

204.    Defendant Heath used the conduct disordered label with reckless

disregard of the impact on Plaintiff's mental health to justify continued and

prolonged isolation and the provision of less intensive psychological and psychiatric

treatment and counseling services than required by Plaintiff's serious mental

health problems;

205.    Defendant Heath failed to provide individual interventions in a

meaningful way;

206.    Defendant Heath consistently failed, by herself and with others, to

develop a plan for the further care of Plaintiff each time placement in isolation

exceeded 24 hours;

207.    Even when it became apparent that Plaintiff was experiencing

deteriorating mental health as a result of the improper reliance on isolation as the

means of managing his behavioral problems, Defendant Heath failed to make

recommendations for changes in the conditions of his confinement as required by

34-A M.R.S.A. § 3809, with deliberate indifference to the Plaintiff's serious medical

needs;

208.   As a direct and proximate result of Defendant Heath's failure to take

action to restrict excessive use of isolation, Plaintiff was confined in isolation for

excessive periods of time, under conditions which did not conform to applicable

federal and state standards, and under conditions which constituted cruel and

unusual punishment in violation of his rights guaranteed in the Eighth Amendment

to the United States Constitution, the Fourth, Fifth, and Fourteenth Amendments

to the United States Constitution, and in violation of the laws of the State of Maine;

209.   Accepted practices mandate that a child should be restrained by

mechanical means only as a precaution against escape, for medical reasons by

direction of the medical officer, or to prevent self-injury or injury of others, and once

applied, should only continue until the child is calm and compliant;

210.   Defendant Heath knew or should have known that mechanical

restraints were being applied to Plaintiff frequently, as an improper means of

behavior control, for punishment, or for other reasons not sanctioned by written

policies, and for time periods far in excess of that even minimally justified by Plaintiff's behavior;

211.    As a direct and proximate result of Defendant Heath's actions as to excessive use of restraints, including failure to take action to enforce the written policy, Plaintiff was held in restraints for excessive periods of time, under conditions which did not meet applicable state policies, and under conditions which constituted cruel and unusual punishment, all in violation of his rights guaranteed in the Eighth Amendment to the United States Constitution, the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution, and in violation of the laws of the State of Maine;

212.    As a direct and proximate result of Defendant Heath's failure to adequately diagnose his mental health conditions and failure to rein in excessive use of isolation and excessive use of mechanical restraints, Plaintiff was subject to physical and psychological harm, all in violation of his rights guaranteed in the Fourth, Fifth, Eighth, and Fourteenth Amendments to the United States Constitution, and in violation of the laws of the State of Maine;

213.    As a direct and proximate result of Defendant Heath's breach of her statutory duty, Plaintiff suffered and continues to suffer serious mental anguish,

psychological and emotional distress, physical pain and suffering, and lost earning

capacity, some or all of which may be permanent;

214.    The actions of Defendant Heath, acting under color of state law,

deprived Plaintiff of his rights, privileges, and immunities under the laws and

Constitution of the United States; in particular, the right to be secure in his person,

the right to be free from cruel and unusual punishment, and the right to due

process;

215.    By these actions, Defendant Heath has deprived Plaintiff of rights

secured by the Fourth, Fifth, Eighth, and Fourteenth Amendments to the United

States Constitution, in violation of 42 U.S.C. § 1983.

**COUNT IX:  DEFENDANT [FIRST NAME UNKNOWN] DEWITT, DEFENDANT DANIEL NEE, DEFENDANT RICK RODGERS, DEFENDANT [FIRST NAME UNKNOWN] BERRY, DEFENDANT [FIRST NAME UNKNOWN] CAIN, DEFENDANT CHRISTOPHER COYNE, DEFENDANT [FIRST NAME UNKNOWN] COYNE, DEFENDANT DANIEL DICKSON, DEFENDANT [FIRST NAME UNKNOWN] DOTAY, DEFENDANT [FIRST NAME UNKNOWN] FAUS, DEFENDANT [FIRST NAME UNKNOWN] HASSON, DEFENDANT [FIRST NAME UNKNOWN] HAWKINS, DEFENDANT KIMBERLY ACKLEY GENDRON, DEFENDANT BARRY LEMERY, DEFENDANT BRIAN MACDOUGALL, DEFENDANT MATTHEW NEE, DEFENDANT [FIRST NAME UNKNOWN] NICHOLS, DEFENDANT JEFF TARDIFF, DEFENDANT [FIRST NAME UNKNOWN] THURWELL, DEFENDANT N. VEILLEUX, DEFENDANT MICHAEL WHELAN**

216.    Plaintiff realleges the statements contained in Paragraphs 1-215 as if

more fully set forth herein;

217.    During times relevant hereto, Defendants worked as Training School Counselor Supervisors and/or Training School Counselors at MYC;

218.    In violation of Defendants' duty to treat and rehabilitate Plaintiff, Defendants routinely initiated placing or restraining Plaintiff in isolation as a means of punishment in violation of the standards for the use of isolation and routinely used physical mistreatment and excessive force against Plaintiff, causing physical and psychological injury to Plaintiff;

219.    As a direct and proximate result of Defendants' breach of their statutory duty, Plaintiff suffered and continues to suffer serious mental anguish, psychological and emotional distress, physical pain and suffering, and lost earning capacity, some or all of which may be permanent;

220.    The actions of Defendants, acting under color of state law, deprived Plaintiff of his rights, privileges, and immunities under the laws and Constitution of the United States; in particular, the right to be secure in his person, the right to be free from cruel and unusual punishment, and the right to due process;

221.    By these actions, Defendants have deprived Plaintiff of rights secured by the Fourth, Fifth, Eighth, and Fourteenth Amendments to the United States Constitution, in violation of 42 U.S.C. § 1983.

## ADDITIONAL ALLEGATIONS RELEVANT TO ALL COUNTS

222.    Plaintiff realleges the statements contained in Paragraphs 1-221 as if more fully set forth herein;

223.    The Maine Department of Corrections ("DOC") is the governmental department of the State of Maine with primary responsibility for correctional programs, including juvenile correctional facilities such as the former Maine Youth Center, and has its principal office in the City of Augusta, County of Kennebec and State of Maine;

224.    It is clearly established that the 14th Amendment's due process requirements prohibit juvenile correctional facilities from confining children in conditions that amount to punishment or that represent a substantial departure from accepted professional judgment;

225.    It is clearly established that the 14th Amendment due process rights of a juvenile in its custody are violated if MYC staff exhibited deliberate indifference to the juvenile's medical needs that are equivalent to an intent to punish;

226.    During times in which Plaintiff was confined to the ICU, Plaintiff was subjected to conditions that amounted to punishment and constituted a substantial deviation from accepted professional judgment;

227.   34-A M.R.S.A. § 3802 sets forth an example of the accepted professional judgment regarding the safeguards required when a juvenile correction facility places a child under observation or in isolation;

228.   DOC held Plaintiff in ICU for extended periods in conditions that represented a substantial departure from 34-A M.R.S.A. § 3802;

229.   During Plaintiff's extended confinement in isolation, DOC staff demonstrated deliberate indifference to Plaintiff's medical and emotional needs that are equivalent to an intent to punish Plaintiff;

230.   During the periods when Plaintiff was placed in mechanical restraints, DOC staff demonstrated deliberate indifference to Plaintiff's medical and emotional needs that are equivalent to an intent to punish Plaintiff;

231.   DOC repeatedly and consistently placed Plaintiff in mechanical restraints for extended periods which demonstrated a substantial departure from DOC policies and procedures;

232.   During those periods when Plaintiff was held in mechanical restraints for extensive periods, MYC staff demonstrated deliberate indifference to Plaintiff's medical and emotional needs that are equivalent to an intent to punish Plaintiff;

## COUNT X: DEFENDANT MAINE DEPARTMENT OF CORRECTIONS
## VIOLATION OF AMERICANS WITH DISABILITIES ACT

233.    Plaintiff realleges the statements contained in paragraphs 1-232 as if more fully set forth herein;

234.    Pursuant to 34-A M.R.S.A. § 1001, et seq., Maine DOC was at all times relevant hereto responsible for the administration of the State of Maine's correctional facilities, programs, and services for committed offenders, including juvenile clients committed to MYC and residing at MYC;

235.    At all times relevant hereto, as a department of the State of Maine, DOC was a public entity within the meaning of Title II of the Americans with Disabilities Act (42 U.S.C. § 12131, et seq.) ("ADA");

236.    As a public entity, pursuant to the ADA, DOC was subject to the requirement that no qualified individual with a disability shall, by reason of such disability, be excluded from participation or be denied the benefits of services, programs, or activities of that public entity or be subjected to discrimination by that entity;

237.    At all times relevant hereto during which Plaintiff was a juvenile client residing at MYC, Plaintiff was a qualified individual with a disability as

defined by the ADA, and met the requirements for receipt of services, and/or the participation in programs, and/or activities provided by the DOC at MYC;

238.    During the course of Plaintiff's incarceration at MYC, Plaintiff developed PTSD and became increasingly depressed and anxious as a result of Defendants' conduct toward Plaintiff;

239.    Plaintiff's conditions remained or significantly increased in intensity as Plaintiff continued to be in the charge of MYC;

240.    During all relevant times hereto, Plaintiff's disabilities substantially limited one or more of the major life activities of Plaintiff;

241.    DOC may not discriminate against a qualified individual with a disability on the basis of his disability;

242.    DOC repeatedly excluded Plaintiff from participating in, and/or denied him the benefit of services, programs, or activities of the MYC, and/or subjected him to discrimination by removing him from the general MYC population, holding him in repeated isolation, and holding him in mechanical restraints for unlawfully extended periods, thereby exacerbating his disabilities and intensifying their manifestations;

243.    Plaintiff's confinement in the ICU greatly restricted his access to education, treatment and rehabilitation programs, limited his receipt of essential services, and did not allow him to reach the same level of achievement that was provided to others, and had the effect of excluding him from the service and treatment programs that were intended to rehabilitate him;

244.    The violations alleged in this complaint demonstrate Defendants' violations of Plaintiff's rights, as a juvenile detainee, to be secure in his person, to be free from cruel and unusual punishment, and to be entitled to due process pursuant to the rights secured by the Fourth, Fifth, Eighth, and Fourteenth Amendments to the United States Constitution, and constitute a constitutional violation by the state.

245.    DOC's excessive and prolonged confinement of Plaintiff in ICU and DOC's failure to diagnose and treat treatable conditions which constituted a portion of Plaintiff's disabilities made Plaintiff's disabilities worse and deprived him of the ability to function in society in any meaningful way after his release;

246.    Defendants unreasonably refused to make modifications in policies, practices, customs, and procedures as applied to Plaintiff even though those

modifications were necessary to avoid discrimination on the basis of disability and were necessary to avoid exacerbation of Plaintiff's disabilities;

247.    The policies, practices, customs, and procedures of the DOC in effect during the relevant time periods disproportionally impacted juvenile clients with mental or emotional disabilities, including Plaintiff, by making disabled persons more likely to be held in ICU and more likely to be subjected to mechanical restraints;

248.    As a direct and proximate result of this unlawful discrimination by DOC, Plaintiff suffered and continues to suffer serious mental anguish, psychological and emotional distress, physical pain and suffering, and lost earning capacity due to an inability to function in society;

249.    The actions of DOC deprived Plaintiff of his rights, privileges, and immunities under Title II of the ADA and under the laws and Constitution of the United States, in particular, the right to be secure in his person, the right to be free from cruel and unusual punishment, and the right to due process secured by the Fourth, Fifth, Eighth, and Fourteenth Amendments to the United States Constitution.

**WHEREFORE**, Plaintiff requests this Court to award damages, jointly and severally, as follows:

1. Damages for excessive confinement in isolation, excessive confinement in mechanical restraints, denial of treatment and educational services to which he had a right, and physical and psychological injuries suffered as a result of inadequate staff, including: physical injury, psychological trauma and injury, emotional anguish, and distress;

2. Damages from the DOC for deterioration of Plaintiff's mental health, excessive confinement in isolation, excessive confinement in mechanical restraints, and discriminatory exclusion from participating in or receiving the benefits of services, programs, or activities of the DOC, including: physical injury, psychological injury, emotional anguish, and distress;

3. Damages for lost earning capacity;

4. Damages for pain and suffering;

5. Damages for medical injuries and expenses, including for mental health injuries and ongoing mental health treatment;

6. Punitive damages;

7. Attorney's fees pursuant to 42 U.S.C. § 1988;

8. Attorney's fees pursuant to 42 U.S.C. § 12131 et seq., and 28 C.F.R. 35.175;

9. Such other and further relief as justice may require.

Dated at Kennebunk, Maine this 13th Day of October, 2017.

/s/ Peter Clifford
Peter Clifford, Bar No. 7300
/s/ Andrew P. Cotter
Andrew P. Cotter, Bar No. 5640
Clifford & Clifford, LLC
62 Portland Road, Suite 37
Kennebunk, ME  04043
(207) 985-3200
peter@cliffordclifford.com